FRANK HARAGO, Plaintiff, *v.* COMMONWEALTH BANK, Defendant.

Supreme Court, New York County, February 13, 1920.

*Grace Huniston*, for the plaintiff.

*Jonas & Neuburger*, for the defendant.

FRANKENTHALER, J. This is an application by the plaintiff for a new trial on the ground of newly-discovered evidence. The case

has been tried twice; the first trial resulting in a disagreement, and the second one in a verdict for the defendant, from which no appeal was taken. As the justice who presided at the last trial, and who settled the record, is now sitting in the Appellate Division, it devolved upon me to peruse the minutes of the trial and the numerous exhibits as well as to read the voluminous affidavits presented in support of and in opposition to the motion. The action was brought to recover from the defendant an alleged balance of $4,507.65, due on a savings bank account. The defendant conceded that $100 was due, but denied any further liability. Plaintiff's proof at the trial was that on July 9, 1924, toward closing hours he presented his bank book with $2,200 in bills for deposit, and requested that a new book be issued to him. He explained that he had accidentally dropped his old one in the bowl of a lavatory and that on recovering it, although he had wiped it with a rag and dried it in the sun, it still presented a defaced and stained appearance. According to plaintiff, the teller, one Bartos, who received the $2,200, refused to give him a new book in view of the lateness of the hour. He made the deposit entry in the old book, but this produced a somewhat blurred effect. The plaintiff complained about this, and thereupon Bartos is said to have retraced the outlines of the $2,200 entry as well as other items on that page in order to make them more legible. The book indicates an original writing of the entries, hereinafter referred to as underwriting, and also a tracing over their outlines referred to as overwriting. Plaintiff did not again present himself at the bank until one year later, when he wanted to make another deposit. At that time a different teller was at the window, and plaintiff again requested a new passbook. The teller conferred with Mr. Blank, the manager, in connection with a discrepancy which now came to their notice, the passbook indicating a balance of $4,507.65, while the bank records showed a balance of only $100. The book was thereupon retained by the bank for several hours and then returned to plaintiff's representative, who once more delivered it to the manager, upon the understanding that the latter would present the book to the board of directors for the purpose of investigation. It was kept by the bank for about ten days, during which time its experts made certain chemical tests, and was delivered to the plaintiff only after he had brought proceedings in the Magistrate's Court to compel its return. The testimony of defendant's witnesses, on the other hand, showed instead of a deposit of $2,200, plaintiff had made a withdrawal of $2,207.65 on that day and had signed a receipt therefor. The inference was that plaintiff or others under his direction had eradicated the

figures from the withdrawal column and had made other erasures and entries to correspond so as to bring the total balance in accord with his claim. Defendant further took the position that plaintiff had deliberately disfigured the book and had made various over-writings in order to support his story of the accidental immersion of the passbook and of the circumstances under which the over-writing was alleged to have been made by the teller Bartos. Much expert testimony was introduced on both sides, defendant making a hypothetical restoration of the last line in the passbook alleged to have been materially tampered with in order to show that the original balance of $100 had been altered to $4,507.65. Plaintiff's experts, on the other hand, showed that none of the writing in the bank book could be attributed to the plaintiff. No satisfactory explanation was offered by the latter at the trial as to the receipt for $2,207.65 in possession of the bank, but he insisted that he never withdrew any sum on that date. It should be mentioned that there were only one or two withdrawals in the plaintiff's passbook, and these of small amounts, and that his visits to the bank to make deposits had been infrequent. Furthermore, the bank record in the shape of plaintiff's ledger card, in the custody of the bank at all times and presented at one of the previous trials, shows erasures in the deposit column and elsewhere which were not satisfactorily explained. The newly-discovered evidence con-sists of an affidavit by one Julia Bambeck, the owner of a shoe store. She swears that on July 9, 1924, the date of the alleged deposit, she stood alongside of the plaintiff at the next window. She witnessed the altercation between the plaintiff and Bartos regarding his demand for a new passbook, saw Harago give the teller, whom she recognized as Bartos, a large roll of bills, and also saw the latter retrace the items in the book to make them more legible. She explains that she came into the case under the follow-ing circumstances: A customer of her store by the name of Moritz Niner was discussing with her husband a certain bank case and the loss of money by a depositor. She connected this story with the incident of Harago, and knowing the latter by sight, sought him out and told him what she had witnessed that day at the bank. Plaintiff, who is a man of but small means, thereupon consulted his present attorney, who investigated the newly-dis-covered evidence and employed experts to examine the documentary data in the case. This investigation began some time in 1928.

Assuming, as we may in such a case, that the new evidence has probative force (*Laird* v. *Ahl*, 140 App. Div. 659), the question remains: Is it likely to change the result? In this connection the following extract from the able and instructive charge of Mr. Justice

PROSKAUER to the jury is very illuminating: " On the 9th of July, 1924, Mr. Harago had a transaction with the Commonwealth Bank. He says he deposited $2,200. They said he drew out $2,200 and did not deposit anything. That is the question you ought to decide. Did he deposit $2,200 or did he draw out $2,200? Every other thing that has been talked about in this case has no importance, excepting as it aids you to answer that question." All the direct or eyewitness testimony at the trial was by interested parties, the evidence given by others being circumstantial or inferential. On this application, however, there is presented the testimony of a disinterested witness who saw the events testified to by plaintiff and who supports his version in essential particulars. Plaintiff contends that the story of this new witness, if believed by the jury, would weigh the balance in his favor and change the result of the trial. In addition to the proposed testimony mentioned, plaintiff offers a voluminous and detailed analysis by experts of the documentary evidence. One of them, Mr. Hurst, unequivocally states that the overwriting and the underwriting are in the handwriting of Teller Bartos, and that the comparatively unbroken surface on the last line of the withdrawal column indicates no erasures. The testimony of another handwriting expert, Mr. Lewis, is to the effect that the signature on the withdrawal receipt, which was the main piece of documentary evidence relied upon by defendant at the last trial, is a forgery. While the testimony of the experts is not, strictly speaking, newly discovered, it creates, in connection with the affidavit of Mrs. Bambeck, an atmosphere which, in the interests of justice, should be cleared up. It is significant that upon this motion no affidavit of Bartos is offered on behalf of the defendant and no adequate explanation is made of its absence. While it is not feasible to present a detailed analysis of the facts upon which the experts for the plaintiff base their conclusions, there are several features of the documentary proof that tend to support plaintiff's story. Among these are: *First*, the comparatively smooth surface on the last line of the withdrawal column, indicating the probability that neither plaintiff nor those in privy with him made any erasures there to obliterate an entry; and, *second*, the testimony that both the underwriting and overwriting of the figures are those of Bartos. The opinion of Mr. Hurst that Bartos first made the entry with the regular steel pen of the bank, and thereafter overwrote the entry with his fountain pen to make it more distinct, supports the view that the original entry of $2,200 in the deposit column was made by Bartos and not by any other person, and lends weight to plaintiff's version of the incidents of July 9, 1924. The conclusion of the expert is supported by a comparison of conceded specimens of the handwriting of

Bartos, which were not available at the previous trials and which were not then demanded because the entire interest of plaintiff's experts at that time was to prove that he was not the author of the alleged forgery. Defendant's expert denies that it is possible to determine that overwriting is in the same hand as underwriting, because the former is not of a spontaneous nature, but is guided by the outlines of the latter. On the other hand, this assertion is somewhat inconsistent with his admission that he made a report to the bank that the underwriting was that of Bartos, but the overwriting was not. An analysis of the new evidence, considered with that offered at the trial, and all weighed in connection with the expert opinion based on the documentary proof, leads me to the opinion that such new evidence, if established to the satisfaction of the jury, will probably change the result upon a new trial.

I am also convinced that it could not have been discovered in the exercise of reasonable diligence before trial. The defendant objects to the " laches " of plaintiff in making a motion for a new trial more than a year after the discovery of Mrs. Bambeck's knowledge of the affair. The delay is, however, not entirely unexplainable. The poverty of the plaintiff, the necessity of a thorough investigation, and of obtaining competent expert testimony to re-examine the facts in the light of the new evidence, were all obstacles to a prompt proceeding on his part. But even if he has not moved in the matter with diligence, his case is one in which the interests of justice require a new trial. (*Frohlich* v. *Zeltzer*, 185 App. Div. 103, 110.) The comments of the court in *Platt* v. *Munroe* (34 Barb. 291, 294) are quite appropriate here: " The books are full of exceptional cases, in which the development of truth and the promotion of substantial justice have been deemed sufficient reasons for granting new trials, although they were not within any former precedent, and consequently not within the operation of any principle or rule established for the guidance of courts in the exercise of their discretion." In *Keister* v. *Rankin* (34 App. Div. 288, 292) the application was not made until after affirmance of the judgment. The court, waiving aside the lateness of the application, said: " It is urged that it it too late to make such a motion after an appeal and the affirmance of a judgment. It is never too late to do justice; and where the ends of justice require that a new trial should be granted, the Supreme Court may act, although the case may have been in the Court of Appeals, and disposed of there."

In the light of these principles plaintiff has to my mind brought himself within the spirit of the rules which control the granting of new trials on the ground of newly-discovered evidence, and the motion is, therefore, granted. Settle order.